**STATE of Minnesota, Respondent,**

v.

**Tavon Tarrel TIMBERLAKE, Appellant.**

**No. A06–72.**

Supreme Court of Minnesota.

Feb. 14, 2008.

## OPINION

GILDEA, Justice.

Appellant Tavon Tarrel Timberlake was charged as a felon in possession of a firearm, in violation of Minn.Stat. § 624.713, subd. 1(b) (2006). Timberlake moved to suppress the gun, arguing that the search was unlawful because police did not have a sufficient basis to stop the motor vehicle in which he was a passenger. The district court denied the motion, and the court of appeals reversed. Because we conclude that police had a sufficient basis to conduct an investigatory stop of the vehicle, we reverse.

We begin with a brief discussion of the facts giving rise to this offense. While on routine patrol on May 30, 2004, St. Paul police officers Robert Jerue and Axel Henry monitored a dispatch call that came in at approximately 11:30 p.m. The dispatch informed squads in the area that the department had received a 911 call from an identified private citizen. The caller told police that a black male and black female were just seen leaving a gas station in a white Pontiac Grand Prix. The female was the driver and the male was the passenger. The caller further explained that while at the gas station "[h]e saw the male get out," and "[w]hen the male exited the vehicle, something fell off of his lap or out of his pocket, out of his hand." The caller saw

"what he described as a gun to the dispatcher, laying on the ground."[1] He "then saw the black male passenger quickly pick up the gun and get back into the car." The caller gave police his name and phone number and said that he would testify if necessary.

The officers were in the area of the gas station, and within a half-minute of hearing the dispatch information, officers Jerue and Henry saw a black female driving a white Grand Prix with a black male riding in the passenger seat. Based on the information they received from the dispatch call, the officers stopped the Grand Prix. After removing the driver and the passenger, who was subsequently identified as Timberlake, police found a loaded semiautomatic handgun under the front passenger seat. Timberlake was then arrested and subsequently charged as a felon in possession of a firearm, in violation of Minn.Stat. § 624.713, subd. 1(b) (prohibiting "a person who has been convicted of * * * a crime of violence" from possessing a pistol or other firearm).[2]

Prior to trial, Timberlake asked the district court to suppress the gun. The court denied the motion. Following a jury trial, Timberlake was found guilty of violating Minn.Stat. § 624.713, subd. 1(b), convicted, and sentenced to 60 months in prison. On appeal, the court of appeals reversed, holding that the police did not have a sufficient basis to stop the vehicle. *State v. Timberlake*, 726 N.W.2d 509, 516 (Minn.App. 2007). Specifically, the court concluded that "mere suspicion that a person possesses a gun is insufficient to warrant a *Terry* stop, absent additional particular and objective facts which create a reason-

---

1. The informant did not describe the gun in any way or identify it as a pistol.

2. Because the only issue before us is whether the police had a sufficient basis to support a stop of the vehicle, we do not discuss or analyze their post-stop conduct.

able suspicion that the possessor does not have a permit or is otherwise about to commit a crime." *Id.* at 514. We granted the State's petition for review.

■ We are asked to determine whether the district court erred when it denied Timberlake's motion to suppress the gun. When we review a pretrial order on a motion to suppress where the facts are not in dispute, as here, we review the decision de novo and "determine whether the police articulated an adequate basis for the search or seizure at issue." *State v. Flowers*, 734 N.W.2d 239, 247–48 (Minn.2007).

■ Both the United States and Minnesota Constitutions protect against "unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. To determine whether this constitutional prohibition has been violated, we examine the specific police conduct at issue. *See State v. Davis*, 732 N.W.2d 173, 178 (Minn.2007). The conduct at issue here is the investigatory stop of a motor vehicle. The United States Supreme Court has held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). We have held that the "principles and framework of *Terry* [apply when] evaluating the reasonableness of [searches and] seizures during traffic stops even when a minor law has been violated." *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn.2004); *see also State v. Wiegand*, 645 N.W.2d 125, 133 (Minn.2002) (concluding that "the *Terry*

principles are appropriately applied * * * when a motor vehicle is stopped"). The question before us therefore is whether a report from an identified private citizen that a person is carrying a gun in a motor vehicle provides police with a reasonable, articulable suspicion of criminal activity sufficient to justify an investigatory stop of the motor vehicle.[3]

■ We have recognized that "the reasonable suspicion standard is 'not high.'" *State v. Bourke*, 718 N.W.2d 922, 927 (Minn.2006) (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997)). While the standard is less demanding than probable cause or a preponderance of the evidence, it "requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123, 120 S.Ct. 673 (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). Police "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"'' of criminal activity." *Id.* at 123–24, 120 S.Ct. 673 (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). They must articulate a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). That standard is met when an officer "observes unusual conduct that leads the officer to reasonably conclude in light of his or her experience that criminal activity may be afoot." *In re Welfare of G.M.*, 560 N.W.2d 687, 691 (Minn.1997).

■ The reasonable suspicion standard can also be met based on information provided by a reliable informant. *Id.* But information given by an informant must

---

**3.** Timberlake does not argue that police needed probable cause to stop the vehicle. Rather, he assumes that reasonable, articulable suspicion is the applicable standard, and he contends that standard was not met here.

bear indicia of reliability that make the alleged criminal conduct sufficiently likely to justify an investigatory stop by police. *See Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (face-to-face information from a known informant "carried enough indicia of reliability to justify the officer's forcible stop of [the defendant]."). "We presume that tips from private citizen informants are reliable." *Davis,* 732 N.W.2d at 182. This is especially the case "when informants give information about their identity so that the police can locate them if necessary." *Id.* at 183 (citing *City of Minnetonka v. Shepherd,* 420 N.W.2d 887, 888, 890 (Minn. 1988), for the proposition "that a tip from an informant identifying himself as 'a station attendant at the Q Petroleum Station in Minnetonka' that he had 'observed an intoxicated driver leave the gas station' in a vehicle he identified by color and license plate was sufficient to give police reasonable suspicion that the driver was intoxicated"). Timberlake does not dispute the caller's reliability in this case. Rather, his argument hinges on the legality of possessing a firearm in public.[4]

█ Timberlake contends that because it is legal in Minnesota for a private citizen to carry a permitted gun in public, police may not conduct an investigatory stop without additional evidence that the possession itself is illegal. For example, Timberlake argues the police would need to suspect that the person carrying the gun does not have a valid permit or that some other criminal activity is afoot to warrant an investigatory stop. The State argues that police may conduct an investigatory stop of a motor vehicle without running afoul of the Constitution based on a report of gun possession inside the vehicle, because it is unlawful in Minnesota to possess a gun in a public place without a permit. Because the parties' arguments are based on Minnesota's firearm permit law, we turn first to an examination of that statute and our jurisprudence construing it.[5]

█ Minnesota Statutes § 624.714, subdivision 1a (2006), provides that "[a] person * * * who * * * possesses a pistol in a motor vehicle * * * without first having obtained a permit to carry the pistol is guilty of a gross misdemeanor." We first construed this language in *State v. Paige* and concluded that "[t]he statute is * * * properly characterized as a 'general prohibition'" on the possession of firearms in public because "[a]nyone having a firearm in a public place may be prosecuted if he has no permit." 256 N.W.2d 298, 303 (Minn.1977); *see also State v. Folstrom,* 331 N.W.2d 231, 233 (Minn.1983) ("[P]ossession of a pistol without a permit [is] a crime * * *."). We determined in *Paige* that the "without a permit" language does

---

4. Timberlake cites *Florida v. J.L.* as standing for the proposition that the United States Supreme Court rejected an " 'automatic firearm exception' to the rule in *Terry."* *United States v. Ubiles,* 224 F.3d 213, 218 (3d Cir.2000) (quoting *Florida v. J.L.,* 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)). But the issue in *J.L.* was whether the informant was reliable and the Court held that he was not. *J.L.,* 529 U.S. at 274, 120 S.Ct. 1375. The Court "did not consider under what circumstances a reliable tip that someone was carrying a gun would provide the police with reasonable suspicion." *United States v. Val-*

*entine,* 232 F.3d 350, 354 (3d Cir.2000). *J.L.* therefore does not inform the issue presented in this case.

5. To support his position, Timberlake cites cases from other jurisdictions. *See Ubiles,* 224 F.3d 213; *United States v. DeBerry,* 76 F.3d 884 (7th Cir.1996). Cases from other jurisdictions are not particularly helpful because they depend on interpretation of a particular state's or territory's gun licensing statute. Here, we rely only on our own interpretation of Minnesota's statute.

not add another element to the crime of carrying a pistol in a public place.[6] 256 N.W.2d at 203. Instead of an element of the crime, we said that the "without a permit" language creates an exception to criminal liability that places a burden on the defendant to come forward with some evidence of a permit. *Id.* at 303–04. Accordingly, we held that the State did not have to prove as part of its case-in-chief that the defendant did not have a permit. *Id.* at 303.[7]

The State argues that consistent with our determination in *Paige* that lack of a permit was not an element of the offense, the police in this case did not need to know whether Timberlake had a permit in order to have a reasonable suspicion that Timberlake was engaged in criminal activity. We agree that our analysis in *Paige* supports the conclusion that the officers had a reasonable basis to suspect that Timberlake was engaged in criminal activity, even without knowing whether he had a permit, based on the caller's report that he saw Timberlake with a gun in the vehicle. But Timberlake notes that the statute has been amended since *Paige*, and he appears to suggest that these amendments overrule our construction of the statute in *Paige*.

Timberlake is correct that the legislature has amended the statute since *Paige*. Indeed, the legislature made extensive changes to the permitting provisions in the statute. *Compare* Minn.Stat. § 624.714, subds. 2–5 (1976), *with* Minn.Stat. § 624.714, subds. 2–4, 6–7 (2006). But the legislature did not change the permit language we construed in *Paige* as creating an exception to criminal responsibility and not an element of the crime. This language, while it has been recodified from subdivision 1 into subdivision 1a, is identical now to the language we construed in *Paige*, and it has been in the statute since it was enacted in 1975. Act of June 4, 1975, ch. 378, § 4, 1975 Minn. Laws 1278, 1281–83. The original language stated, "A person * * * who carries, holds or possesses a pistol * * * in a public place or public area without first having obtained a permit to carry the pistol is guilty of a gross misdemeanor." *Id.* at 1281. In 2003, section 624.714, subd. 1, was repealed by the Minnesota Citizens' Personal Protection Act and replaced by current subdivisions 1a (permit required; penalty) and 1b (display of permit; penalty). Act of Apr. 28, 2003, ch. 28, art. 2, §§ 4–5, 35, 2003 Minn. Laws 265, 274, 290. Current section 624.714, subd. 1a (2006), is identical in all material respects to section 624.714, subd. 1 (1976), and maintains the phrase "without first having obtained a permit to carry the pistol." In short, the language used in the statute does not support Timberlake's argument that the legislature intended, with the 2003 amendments, to overrule *Paige*, and Timberlake has not brought to our attention any discussion by

---

6. In *Paige*, we generally used the phrase "without a permit" rather than specifically referring to the "without first having obtained a permit" language contained in the statute. *See* 256 N.W.2d at 303.

7. Timberlake contends that our discussion in *Paige* about whether the phrase "without a permit" is an element of the offense is dictum and therefore not binding. Dicta are generally "considered to be expressions in a court's opinion which go beyond the facts before the court and therefore are the individual views of the author of the opinion and not binding in subsequent cases." *State ex rel. Foster v. Naftalin*, 246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956). In *Paige*, we held that a conviction for carrying a pistol in a public place had to be reversed because the county attorney introduced the pistol at trial in contravention of a suppression order. 256 N.W.2d at 302. We interpreted the "without a permit" language in order to guide the defendant's retrial following our remand. *Id.* That discussion therefore is not dictum.

the legislature during the amendment process that would support the conclusion that the legislature intended to overrule *Paige.*

Not only is the operative language in the statute the same as it was when we decided *Paige,* but the legislature also added other provisions to the statute that reinforce our conclusion in *Paige* that the non-existence of a permit is not an element of the crime, but that the permit holder has the obligation to provide evidence of his permit as a way to avoid criminal responsibility. For example, the legislature has placed the obligation on the permit holder to carry his permit card with him at all times when carrying the pistol and to "display the permit card and identification document upon lawful demand by a peace officer." Minn.Stat. § 624.714, subd. 1b(a). In addition, the legislature also requires that "[u]pon the request of a peace officer, a permit holder shall disclose to the officer whether or not the permit holder is currently carrying a firearm." *Id.,* subd. 1b(d). Finally, we said in *Paige* that a permit holder could avoid prosecution for carrying a firearm in public by presenting a valid permit and identification to police. 256 N.W.2d at 303.[8] In the 2003 amendments, the legislature specifically included this affirmative defense in the statute. Minn.Stat. § 624.714, subd. 1b(b) ("A citation issued for violating paragraph (a) must be dismissed if the person demonstrates, in court or in the office of the arresting officer, that the person was authorized to carry the pistol at the time of the alleged violation."). These recent pro-

visions lend support to our construction of the statute in *Paige.*[9]

We conclude that the legislature did not intend to overrule *Paige* through the Minnesota Citizens' Personal Protection Act and in fact added provisions that buttress our analysis in *Paige.* *See* Minn. Stat. § 645.17(4) (2006) ("[W]hen a court of last resort has construed the language of a law, the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language * * *.").

In addition to his argument about the effect of the statutory amendments, Timberlake also argues that *Paige* has been undermined because, subsequent to *Paige,* we have treated similar language in other criminal statutes as creating an element of the offense. *See State v. Burg,* 648 N.W.2d 673, 678–79 (Minn.2002) (interpreting the phrase "without lawful excuse" in the nonsupport of a child statute as an element of the offense and observing that "[b]y embedding the phrase 'without lawful excuse' in the definition of the offense, the legislature demonstrated its intent to include the absence of a lawful excuse as one of the facts necessary for a conviction"); *State v. Brechon,* 352 N.W.2d 745, 750 (Minn.1984) (holding that a claim of right in a criminal trespass case is not a defense but a basic element of the State's case that the State must prove beyond a reasonable doubt). But we have said that in distinguishing between an element of a crime and an exception to a statute, "[i]n order to

---

8. We also noted that if the defendant presents evidence of a permit, the burden shifts back to the State to show that the permit is invalid or has been violated. *Paige,* 256 N.W.2d at 304.

9. In the 2003 amendments, the legislature added the recognition and declaration "that the second amendment of the United States Constitution guarantees the fundamental, in-

dividual right to keep and bear arms. The provisions of this section are declared to be necessary to accomplish compelling state interests in regulation of those rights." Minn. Stat. § 624.714, subd. 22 (2006). Timberlake does not claim that his Second Amendment rights were violated. We therefore have no occasion to reach that issue in this case.

place the burden of proving the 'exception' on the defendant, a court must decide that the act in itself, without the exception is 'ordinarily dangerous to society or involves moral turpitude' and that requiring the state to prove the acts would place an impossible burden on the prosecution.'" *Brechon*, 352 N.W.2d at 749 (quoting *Williams v. United States*, 138 F.2d 81, 82 (D.C.Cir.1943)). Possession of a firearm is distinguishable from nonpayment of child support or criminal trespass in terms of its potential danger to society. For that reason, *Burg* and *Brechon* do not undermine our interpretation of the permit provision in Minn.Stat. § 624.714, subd. 1, as an exception to—rather than an element of— the crime of carrying a pistol in a public place. *See Paige*, 256 N.W.2d at 303.

Timberlake finally relies on our decision in *State v. Cripps*, 533 N.W.2d 388 (Minn. 1995), to support his argument that the investigatory stop in the present case was unlawful because officers had no reason to suspect that unlawful activity was afoot. In *Cripps*, an officer conducting a check for identification of bar patrons to enforce minimum alcohol consumption age requirements approached the defendant in a bar and asked for identification. *Id.* at 389–90. When the defendant gave police false identification, she was arrested. *Id.* at 390. We held that the seizure was unlawful because police failed to articulate "a sufficient individualized suspicion of criminal activity." *Id.* at 392. In the case of underage drinking, however, age is an element of the offense. Minn.Stat. § 340A.503, subd. 1(a) (2006) ("It is unlawful for any * * * (2) person under the age of 21 years to consume any alcoholic beverages."); *see also Cripps*, 533 N.W.2d at 392 ("An officer can justify an investigative seizure of a person who is in a bar if that person appears to the officer to be under the legal age to consume alcohol."). Tim-

berlake's reliance on *Cripps* is therefore misplaced.

In sum, we reaffirm our interpretation of Minn.Stat. § 624.714 set forth in *Paige*. Based on *Paige*, we hold that police had a reasonable, articulable suspicion that Timberlake was engaged in criminal activity based on the reliable informant's report that Timberlake was carrying a gun in a motor vehicle. Accordingly, we reverse the court of appeals' decision and reinstate Timberlake's conviction.

Reversed.